The next matter, No. 24-1523 and No. 241707, Northeastern University v. National Labor Relations Board. These cases are cross-petitions. Would the petitioner cross-respondent, Northeastern University, please introduce themselves on the record to begin. Good morning, and may it please the Court, Robert Fisher and John Phillips for Northeastern University. May I reserve three minutes for rebuttal? You may. Thank you. Fundamentally, this case is about the Regional Director's, ultimately the Board's, determination that Northeastern's sergeants and sergeant detectives are not supervisors in the meaning of the Act. To put it simply, the determination is not based upon substantial evidence in the record as a whole. There are three different ways in which the sergeants and sergeant detectives are supervisors under the Act. They assign, they are responsibly direct, and they discipline, each of which involves the exercise of independent judgment. With the Court's permission, I'll start with assign. The only issue here is independent judgment. The Regional Director below understood that the sergeants assign patrol officers and community service officers, CSOs. They essentially say at the beginning of the shift, I'm sending you there, I'm sending you there. And then throughout the shift, they reevaluate where those people are and redeploy them. In the case of the detective sergeants, the sergeant detectives, excuse me, they are assigning cases to detectives to then investigate those cases. The only question, again, is independent judgment. The Board's decision in Oakwood tells us what independent judgment is. And I would submit that the case, at least the assigned piece of the case, begins and ends at that definition, which is independent judgment is personal judgment based upon personal experience, training, and ability. That's what it is. And ultimately, the Board's position, the Regional Director's position, was their authority was hemmed in or was mechanical. And I would submit to you that the Board is simply picking and choosing among the record. So I wanted to address first the mechanical aspect. The Regional Director below and the Board in this brief here, they parrot the phrase that the officers are equally qualified to do the job. And in its brief, they cite to Lieutenant Keeling for that and they cite to Sergeant Washington. But it's worth looking at what those two individuals actually said. The testimony that the Board relies on with Lieutenant Keeling has to do with details. And the question he was asked was, essentially, in order to work a detail, does an officer have to be able to work all the posts? And he said, yes. A detail is obviously a special overtime assignment. It's not a general day-to-day assignment. And in fact, Lieutenant Keeling testified unequivocally that when deciding whether to assign somebody to a particular call or to a location, you take into account their particular skills, their strengths, and weaknesses. Sergeant Washington, for his part, was specifically asked by counsel for the union whether he uses his knowledge of an officer's skills and weaknesses. And his answer was the following, and this is at Appendix 161. Those are factors in giving officers tasks. He then went on to say that all officers are equally trained to be officers. He also then testified that some officers have specialized training, which they take into account, and they have different investigative styles. The Board ignores all of this. Effectively, what the Board submits to you is that these are not patrol officers. They're widgets, that they're just interchangeable. Counsel, if I might, I was sort of focused on two other things, which is the authority to discipline and then the authority to engage in responsibly directing their subordinates. The authority to discipline, you make the same substantial evidence, does not support. But what concerns me is what appear to be two errors of law. The regional director concludes that they lack authority to discipline, quote, because it is essentially hortatory and reportorial in nature. To me, that's not at all the legal standard. And then the Board itself does not defend that finding. They walk away from it, as your brief points out, and instead they come up with a new test that the supervisory function of discipline requires that the supervisor be able to impose disciplinary consequences. But when I look at the text, as you argued, the consequences are transfer, suspend, layoff, or discharge. But then the authority to discipline is listed separately from that. So it has to mean something other than transfer, suspend, layoff, or discharge. So I mean, I'll ask counsel for the Board, but it seemed to me that that is also an incorrect legal standard. And as your brief points out, the Board has switched gears on us and adopted a totally new argument, which as a matter of administrative procedure, they're just not entitled to do. So, Your Honor, there's a lot there. Let me address each of your points. So not surprisingly, I agree with you that the regional director's description of the documents in the evidence as repertorial and hortatory is just wrong. And if you look at what she actually says the law is, she then ignores what she describes the law to be. I don't take issue with the notion, there are a lot of cases cited to you, and a lot of the cases talk about reports to a manager. So if the putative supervisor tells his or her boss, hey, I saw employee X do something, that's just a description of what happened. That would be repertorial. But what is clear is the counselings and the write-ups that are in the record are a lot more than that. These are communications from a sergeant to their subordinate saying, you did something wrong, here's why it's wrong, don't do that again. And the regional director says, well, that's hortatory. And, of course, all lower level discipline to some degree is hortatory. It tells the employee, stop it, and the goal is for them to correct their behavior going forward. So I don't want to mislead you. I totally agree that there's an error of law there. And partly she reaches that result by saying, although Northeastern describes its discipline system as a progressive discipline system, that no, it isn't, because there was a change in how the records were kept of this. The change was brought about by state law, which actually it's probably a good thing that they are looking at the discipline of police officers on school campuses and require that these things be submitted to the state. So I sort of thought she got that exactly backwards. If the state thinks it's important and wants to be sure that officers are disciplined, and Northeastern is complying with that, and as I understand it, also putting it in the database as to each, that also just struck me as kind of odd. It is backwards, Your Honor, because even if you look at her description of the facts about that change, the change was really just a process. So before there was a template form for counseling and a write-up. You see them in the record. And then what Northeastern did was now the sergeant is just sending an email to the subordinate employee that captures, and there's examples in the record of this as well, captures the same content. And all that's different now is it CCs the lieutenant for internal affairs. And the facts are absolutely clear as to what the lieutenant is doing. He's not deciding, geez, was that a good discipline or a bad discipline? He's deciding something else, which is, do I need to report this to the state under police reform law? Because these are police officers. They carry weapons. They use force. And so obviously this process is designed to make sure the police are acting appropriately. But the discipline is final when that email is sent. The lieutenant is doing something else. And so I agree with you that that is backwards. Counsel, can I ask you, because I did look at, I actually looked at some of the documents and the substance of what was being said. And I'm just trying to understand under the correct legal standard, it seems to me that the correct legal standard says that if what the employee is doing is providing feedback to someone, that would just be another word I would use, that that's not enough to indicate that they have the power to discipline. And so I'm just wondering what your view is of whether that's what's happening here. Because in a lot of workplaces, people give feedback to one another, and it can be documented, including in annual evaluation processes. That doesn't mean that that person is your supervisor. So why isn't that all that's happening here, and therefore under the correct legal standard, there is substantial evidence to support the regional director's conclusion? So there's two answers to this. One is the standard question, which is, you know, what's the difference between just sort of normal feedback versus discipline? And what the board has said is, does the, whatever that document is, I'm going to be generic about it deliberately, whatever that is, does it lay the foundation for future discipline? Meaning, could the employer turn around and say, well, you know what, we gave you a counseling on this before, and now we're escalating it to a written warning or something. Because, well, you know, we've already talked to you about that. And the testimony is clear that that is what's happening. Lieutenant Keeling described that the sergeants will decide in any given circumstance, well, geez, maybe this is another verbal warning, maybe now I'm going to give a written warning, message received but not heard. And then if it continues, it then escalates to the lieutenant. And it's worth noting that Sergeant Washington understood, and this is the union's only witness, you know, may I finish my answer? Sergeant Washington understood that when he was issuing a counseling or a write-up, it could be then used to lead to more serious discipline. So the standard is clear, that's what they're focused on. And the second issue, if I may, the second reason why it's set up this way is there's a collective bargaining agreement. The people they're supervising are subject to just cause protection. And if you look at the CBA, the union, which happens now to be the union also seeking to represent the sergeants, the union can file a grievance over any discipline that gets issued to a patrol officer or community service officer. And so part of the analysis for the sergeant is what's the appropriate level of discipline because it could get grieved. Thank you. Thank you, Counsel. At this time, would Counsel for the Respondent, Cross Petitioner, NLRB, please introduce himself on the record to begin. Good morning. Eric Weitz on behalf of the National Labor Relations Board with me at Counsel Sable as Counsel for the Intervenor Union. With the Court's discretion, I'll start with the issue of discipline since that was discussed in the opening argument. To be clear, the Board's test for what constitutes discipline under the supervisory indicia is well established and was not contested below. As the Board noted, or excuse me, the Regional Director on behalf of the Board, at page 9 of the DDE, the test is whether an action directly affects the wages and or job status of the individual being evaluated. Simply providing feedback or counseling, if it does not actually impact that employee, is not discipline. Now, one situation where counseling or feedback could qualify as discipline is if it's part of a progressive disciplinary system where this initial step does not actually affect the employee, but it is a formal step in a process that can lead to future discipline. This case, as the Regional Director explained in detail, there is no evidence whatsoever of a sergeant making a counseling or one of these. Okay. So it's not progressive discipline if people actually alter their behavior in response to an oral warning. Or a written warning. You have to have evidence that it failed at those levels and you actually did something more than that in order to meet the Board's test? That's correct, Your Honor. And the reason that that is the test is because the entire purpose of the supervisory exception is to limit the exception of the coverage of the act to truly supervisory employees. So it was contemplated by Congress in setting out these detailed factors that you would have many employees who perform certain supervisory roles in a colloquial sense, who are lead employees or straw bosses or foremen, and who direct other employees who do not meet the... Don't you run directly into the problem that I discussed with your brother, your opponent, which is that the statute, the text of the statute, does not say that an employee should be subject to supervision. The text of the statute says transfer, suspend, layoff, or discharge. Add authority to discipline. Under your test, there has to be a transfer, a suspension, a layoff, or a discharge. Well, that's not true, Your Honor. For example, you could have a counseling if it actually has consequences for an employee. And this Court, I would note, this has been the Board's test for many decades. It was not disputed here. It was very well established. This Court has affirmed it in Hospital General Menendita, 393 Up 3rd at 267-268. I'm sorry, I just don't read it that way. Could you please respond to the argument about why the text does not permit you in a situation where there is evidence of a progressive discipline policy to say you actually have to have disciplined the employee? Well, to be clear, Your Honor, if there was evidence of a progressive disciplinary policy, that's a situation where one of these initial counselings could qualify as disciplined under the Board's test. And so that's why there's a factual dispute here. Okay. So your entire argument depends upon there being no progressive discipline? That's correct, Your Honor. But that's, well, number one, I would just highlight that everything we're discussing here, it was the employer's burden of proof. It was the employer's burden of proof to establish supervisory status. So if the evidence is in conflict or just not sufficient, that's what the Regional Director was finding. But it is true that the Regional Director made a specific finding that there is not sufficient evidence of a progressive disciplinary policy. But partly that was based on what I discussed earlier, which is the transition and processing information in order to comply with the Board's test. But it was state law. How does that render what was a progressive discipline policy no longer a progressive discipline policy? I don't think the Board's finding was premised on that, Your Honor. I'm talking about the Regional Director. Right. The Regional Director's analysis was not predicated on this. We can look at it as two types of counselings in the record. So there's many examples under the old system where counselings would be entered into guardian tracking. And there's two examples of this new system. And the Regional Director noted that, if anything, the new system hurts the employer. But even under the old system, if we assume that had stayed in place, this was not a progressive disciplinary system. I'd also note that to the extent there was this change in policy that was influenced in some way by state law, if anything, state law required lieutenants to play a more active role, that it took discretion away from sergeants to deal with some of these initial level counselings. I didn't understand that portion of your argument. That's helpful. Thank you. Yes, Your Honor. So I think to hopefully clarify further, if we look at these counselings under the pre-post-change guardian tracking system, there's many examples of sergeants writing up incidents, providing feedback, directing employees what to do. There is not a single example of one of those counselings actually leading or contributing to an actual adverse consequence or change in employment status for an officer. In fact, the testimony that the employer relies on for the existence of a progressive disciplinary system, from Lieutenant Keeling at Appendix 150 to 151, in that very testimony when he suggests there's a progressive disciplinary system, the way he defines it is that sergeants can issue multiple counselings, and it is entirely discretionary when they decide to elevate that to a lieutenant for possible discipline. And that's, in fact, what we see in the actual evidence, where many of these counselings outline that officers would be repeatedly counseled informally by the sergeant who is admittedly the lead employee who they report to and who is directing them to comply with certain policies and to correct certain behavior. But again, I think the key legal standard on this issue is, is there any evidence that they could take actions that were beyond feedback and counseling or reportorial and that they could actually affect the officers, which is what the intent of Congress was in creating this exception, is that if you have a subset of employees whose interests are aligned with management, not with their coworkers, that that's considered supervisory status. Counsel, can I ask you, and you can tell me if I'm getting the record wrong, but it was my understanding from the record that if the officers are meeting with the sergeant about a counseling that they'd be entitled to union representation for that meeting, or maybe it's for a write-up, you can tell me which one it is, but I guess the thrust of my question is, if they're entitled to union representation for a meeting like that, doesn't that suggest that they view it as a potential impact on sort of the basics of their employment and they're viewing it as discipline, and does that matter? It's sort of a record question and a legal question for you. I think it's hard to really infer what that means, Your Honor. That's a requirement that was negotiated in the collective bargaining agreement. It's not, for example, there's a legal requirement under Weingarten, an NLRB case, that if there's a potential disciplinary meeting, an employee has a right to union representation. This is something that the parties negotiated. We don't know from the record why the union might have an interest. They may have an interest in not having any kind of negative feedback from a sergeant, but that doesn't suggest that it meets the board's legal test for supervisory status. You think it's rational to exclude that the union is worried about potential further discipline, and that's why they're there, to talk management out of that discipline? I'm not suggesting that's an unreasonable inference or that it's a reasonable conclusion. Why is it reasonable to assume that the only interest is something other than concern about discipline? What was it you just said? It just struck me as so improbable. Well, I guess my answer, Your Honor, is to get back to the ultimate issue in this case, which is did the employer carry its burden of proof. So this may be one of many factual instances. No, no. Tell me again what you said was the union's interest or the police officer's interest in having a union rep with him at these meetings, which Northeastern says is progressive discipline. You say it's not. But what did you just say? Well, I guess my ultimate answer, Your Honor, and I don't know if I'm not saying the same thing again, but the ultimate answer is we don't know from the record. This was not litigated why the union wanted this in. The operative factual finding in this case is that there is simply no evidence that in actual practice an officer has ever faced actual discipline as a result of one of these counselors. Because the union reps are there. Well, I mean, that doesn't prevent the employer from issuing discipline in the face of misconduct. I think, again, this was the employer's burden to prove discipline. And there is not a single instance of one of these counselings actually being taken into account or contributing to an actual adverse action issued by a lieutenant or a higher ranking official. And so I think the ultimate issue here is just the evidence at best is inconclusive. So go back to his opening argument. Sure, Your Honor. Well, I can move on to the assignment, Supervisor Rendicia, unless the Court has any further questions on discipline. So assignment, again, the regional director found and it's conceded that the sergeants do play a role in formally assigning officers on a day-to-day basis. Assigning them shifts and assigning them at the start of each shift to a particular sector of the university. But, again, the legal test for independent judgment is very well established. I'd point the Court to this Court's decision in NSTAR 798 up 3rd at 13, which affirms the Board's Oakwood health care test. And the test makes clear that the level of discretion needs to exceed a certain threshold. That if decisions are made based on detailed instructions, company policies or rules, or if it's the obvious or self-evident choice in a given situation, that does not constitute supervisory independent judgment. Here the record shows that the role that the sergeants play in assigning officers does not meet that threshold. So first starting with time when they assign them to a shift, that process is set out in detail in NSTAR 798. It's in the collective bargaining agreement and really the sergeant is playing just an administrative role in assigning them to an actual shift. Turning to place at the beginning of each shift, there are detailed deployment plans that are prepared by lieutenants, which specify there's, I believe, four sectors of the university campus and there's actual detailed numbers that at the beginning of each shift you need to assign X number of officers here and X number of officers there. And those plans even specify who needs to be on bike and who needs to be on foot, right? There's a chart when I looked at the deployment plan. Correct. And there's details like for an ICT officer, there needs to be one above the orange line tracks, one below. So it's very detailed. So while there is some discretion in putting officer A in the sector or another, there is, again, no evidence that any kind of significant discretion that requires discerning and comparing data, which is the test under Oakwood Health Care. Is there any limit to that discretion in the decision of who to assign where? Well, there's a limit in that the number of officers on a shift is not set by... Specific officers. Are there regulations, rules, procedures in place that limit the sergeant's discretion in terms of determining who is best suited to be in a particular sector? What was the evidence on that? Well, I guess the only evidence of that kind of limitation that comes to mind is if it's an ICT trained officer, there needs to be one in a certain sector and one in another. But beyond that, there is no evidence. However, there's no evidence that sergeants take any kind of expertise or employee-specific attributes into account. And that's why it's significant that the record shows all of the officers are capable of performing the same work. And so when a sergeant is assigning an officer to sector A versus sector B, that's really just a routine clerical role. And again, I hate to be harping the point, but it was the employer's burden to provide concrete examples of what actual discretion goes into that. And the only examples in the record are sort of self-evident, obvious situations. So if you have to assign an officer to a bike patrol, you have to select an officer who has a bike certification. Likewise, when you're assigning an officer to investigate a sexual assault case, there are particular officers who have certifications and trainings to deal with those specific kinds of cases. So that is essentially just matching officers to the task. It doesn't require the threshold of supervisory judgment that the board and this court have required. And that's why the regional director found, again, not that there is no judgment, but that the employer did not satisfy its burden of proving supervisory status. And I see that I'm out of time unless the court has any questions about responsible direction or anything further. Thank you. Thank you, counsel. At this time, counsel for the petitioner cross-respondent has a three-minute rebuttal. Thank you. Robert Tischer for Northeastern. I'm going to just directly address the deployment plan issue that counsel for the board just raised. I would invite the court, it sounds like you've looked at the record, the deployment plans say exactly what they say. And one of the things they say is that sergeants are supposed to adjust the plan depending on the circumstances. And obviously that's a document, so I want to actually talk about what the testimony was about that, which is that this wasn't some hypothetical situation. Sergeant Washington testified that what was in the deployment plan is a true statement. He testified that his job every day is to assess the deployment plan in light of the intelligence report. So you just heard counsel say, well, there's no evidence of analyzing data. At every shift, the sergeant is provided intelligence report regarding what's happening on campus and the surrounding community. And what Sergeant Washington testified to is it is his job to assess the deployment plan in light of that evidence. And at that point, make adjustments either at the beginning of the shift or at any point during the shift as the situation changes on the ground. That is independent judgment, but don't take my word for it, that's what it says. The board in Oakwood says that making decisions under a policy is independent judgment, where the putative supervisor can deviate from the plan or even choose to stay and follow the plan. And I would submit that this court's decision in May and Yankee, and I know it was some time ago, is it reaches the exact same conclusion on what it means for independent judgment. And I just want to say one thing about May and Yankee, because the board in its brief says, well, that's a pre-Oakwood case, so you should ignore it. I would note Oakwood specifically cites to May and Yankee in developing the standards that are articulated in that case. And then I know it's not a legal argument to say, what? But let's talk about the incident containment team, northeastern SWAT team. The sergeant's job is to determine whether a threat is significant enough that it requires deployment of the ICT. And it is correct that every shift has so many officers who are ICT trained on the shift. But the sergeant's job is to decide, one, do you deploy the ICT, then decide, do I have enough resources? Do I need to call people who are not on campus, who are not working and say, I need you in, we have an incident on campus? And then once those people are gathered, the sergeant has to decide, okay, where am I going to put these people? And so the board really has no answer to any of that other than to tell you, well, that's not assignment. And it makes this really odd analogy to Oakwood. I see my time's expired. May I just finish this thought? So in Oakwood, the board distinguishes between assigning a patient to a nurse, which is assignment, versus telling the nurse, give that patient a shot. And calling somebody in off campus to come into work, that's clearly assigning them to a place. Sending them to a building to set up a perimeter, that's clearly assignment. The obvious analogy to an ad hoc task would be the sergeant instructing the police officer to handcuff the suspect they just intercepted. That's a task. But there's no question that to do all of these things requires independent judgment. And the notion that that's just mechanical or routine is frankly laughable. Thank you.